**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| **DEMETRIOUS QUEEN,** | * |
| Plaintiff, | * |
| v. | * Case No.: PWG-14-2941 |
| **PRINCE GEORGE'S COUNTY,** *et al.*, | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Defendant Christopher May, who at the time was a police officer with Prince George's County (the "County"), responded to two noise complaints early on January 19, 2014, along with other County police officers, and found Plaintiff Demetrious Queen at the scene both times, alone, yelling loudly. The second time, they handcuffed Queen but then released him when he calmed down. Both times, they decided not to arrest him. But, about fifteen minutes later, May arrested Queen, striking him in the face with the heel of his palm when he resisted efforts to place him under arrest.

Queen retained counsel and filed suit against May and the County, claiming that "Officer May and other Prince George's County Police Officers hit plaintiff with their fists and a baton seven to eight times and dragged him down seven flights of stairs despite the fact that plaintiff had not committed a crime and despite the fact that plaintiff had not tried to escape or resist arrest." Am. Compl. ¶ 7, ECF No. 17-1. His Amended Complaint includes claims for assault, battery, false arrest, and section 1983 claims based on arrest without probable cause and use of

excessive force in violation of the Fourth Amendment. *Id.* ¶¶ 13–32. I granted the County's unopposed Motion to Bifurcate, ECF No. 11, bifurcating the claims against May from the claims against the County for purposes of trial, with the claims against May to be considered first, and staying discovery as to the County's liability. ECF No. 26. Queen's counsel withdrew his appearance, and Queen now proceeds *pro se*. ECF Nos. 33, 36.

Now pending is May's Motion for Summary Judgment, ECF No. 45. Although it is unopposed, and the time for filing an opposition has passed, *see* Loc. R. 105.2(a), I find that the materials in the record show that genuine disputes exist as to material facts.[1] Therefore, I will deny May's motion and appoint *pro bono* counsel to represent Queen at trial, and this case will proceed to trial on the claims brought against May.

**Standard of Review**

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, No. 12-1722, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986).

---

[1] A hearing is not necessary. *See* Loc. R. 105.6.

When May stated his intention to move for summary judgment, ECF No. 40, the Court scheduled a pre-motion conference call and notified Queen, ECF No. 43, but Queen did not participate in the call, ECF No. 44. May then filed his motion, and the Court informed Queen of his right to respond to the motion, ECF No. 46, but he did not respond. Under these circumstances, "those facts established by the motion" are "uncontroverted." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). Nonetheless, Queen's "failure to respond … does not fulfill the burdens imposed on moving parties by Rule 56," which "requires that the moving party establish, in addition to the absence of a dispute over any material fact, that it is 'entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). Thus, "the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." *Id.*

Significantly, what is before the Court includes not only May's motion but also the exhibits he attached. ECF Nos. 45-1 – 45-5. Moreover, on a motion for summary judgment, although "[t]he court need consider only the cited materials," it "may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). And, I am cognizant that Queen is unrepresented, even if the principle that "[a] document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)), is inapplicable, given that Queen had counsel at the time he filed suit, ECF No. 1, and amended his complaint, ECF No. 17, and has not filed any documents independently. In this case, I have considered not only the cited material that May selected to support his motion, but all of the materials in the record, which includes transcripts from the

depositions of Keona Singletary (Exhibit 1), Shearda Gerald (Exhibit 2), and May (Exhibit 3), as well as the Affidavit of Pofc. Christyal Boone (formerly Officer Rood) (Exhibit 4), and Queen's medical records (Exhibit 5).

### **Factual Background**[2]

In the early morning hours of Sunday, January 19, 2014, Prince George's County police officers responded to two 911 calls from Burnside Road in Palmer Park, Maryland, the first reporting a vehicle theft, May Dep. 4:20 – 6:9, and the second reporting a fight on the front lawn, Gerald Dep. 21:5 – 22:3.  May was one of the responding officers on the first call.  May Dep. 5:20 – 6:11.  When he first arrived, he found Demetrious Queen "pacing back and forth in front of the house, . . . talking to himself." *Id.* at 6:22–25.  Queen and his girlfriend Keona Singletary were attending a party at that location.  Singletary Dep. 11:4 – 12:13.  Queen had started Singletary's car to warm it up and left it unattended, at which time it was stolen.  *Id.* at 4:13.  Singletary recalled that she was "angry" and "kind of got upset with him about the incident, why did he have the car running, things of that nature," but Queen "really wasn't upset. He just said that, you know, he didn't intend for [her] car to get stolen or whatever." *Id.* at 19:1–8.

The police returned when "two gentlem[e]n that were at the party or out in front of the party had some words with Demetrious or something of that nature. . . . [A] verbal exchange took place." Singletary Dep. 21:9–12.  The scene escalated to involve about twenty people "fighting and yelling" outside.  *Id.* at 22:20 – 23:2.  Singletary was inside, but she recalled "a lot

---

[2] In reviewing the evidence related to a motion for summary judgment, the Court considers undisputed facts, as well as the disputed facts viewed in the light most favorable to the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).

of arguing. . . . It was loud. A bunch of arguing back and forth." *Id.* at 22:4–5, 47:18–21. She "believe[d]" that Queen was a part of the argument, and that it "started from the car situation." *Id.* at 24:6–16. Queen left before the police arrived, and "the commotion kind of died down when he left." *Id.* at 41:14–18, 48:4–5.

About an hour later, May and other County police officers responded to a noise complaint from outside 900 Hill Road, Apartment 302, Seat Pleasant, Maryland, where Queen lived with Singletary.[3] Gerald Dep. 19:9–10; 51:17 – 52:11; May Dep. 17:1–21. There, they found Queen outside, "being loud, screaming, seem[ing] to be at himself," and smelling of alcohol. May Dep. 19:4–7, 20:8–9. The officers "had Mr. Queen sit down, began speaking with him, trying to get him to calm down and figure out why he was outside at that time in the morning being loud." *Id.* at 20:13–16. They "decided that no action needed to be taken, and [they] left." *Id.* at 20:17–19.

"[S]hortly after" they left, they "got called backed there for the same incident, with a loud person—or a disturbance at 900 Hill Road. May Dep. 21:24 – 22:3. When they returned, "Mr. Queen was outside, yelling again . . . at himself," loudly. *Id.* at 22:9-22. They asked him to calm down, warned him that "it's an arrestable offense for disturbing the peace due to the fact that it was so early in the morning, individuals were calling in on him," and temporarily handcuffed him in an effort to calm him down, *id.* at 23:4–10; Gerald Dep. 12:6–7.

According to May, Queen's "girlfriend show[ed] up and tr[ied] to calm him down." May Dep. 23:11–12. Singletary testified to the contrary that she did not arrive until Queen was inside

---

[3] Singletary testified on September 10, 2015 that Queen was no longer living at that address. Singletary Dep. 6:10–16, 51:18–21. Queen has not informed the Court of any change of address, as Local Rule 102.1(b)(iii) obligates him to do.

the apartment. Singletary Dep. 51:2 – 52:5. Queen's sister Shearda Gerald testified that it was she who arrived and convinced Queen to calm down. Gerald Dep. 12:4–20. Gerald stated that the officers "allowed [Queen] to make a decision to either . . . leave with [his] sister or . . . to go back upstairs." *Id.* at 17:8–17. Queen chose to go upstairs. *Id.* These inconsistencies are immaterial. What is significant is May's undisputed testimony that, after Queen calmed down and "stat[ed] that he's going upstairs to his apartment and going to bed," the officers "decided not to arrest him" and released him, and he went up to the apartment. May Dep. 23:11–14; *see* Gerald Dep. 12:13–20.

Gerald recalled that the officers "walk[e]d to their vehicles" and were "about to leave" when she asked them to stay because Singletary and her friends had arrived and Gerald thought that "if [the officers] let [Singletary] and her friends go up there it might escalate . . . to probably them arguing." Gerald Dep. 17:8 – 18:20. Singletary testified that when she arrived, she "was stopped by a female officer who informed [her] that [she] could not go . . . in right now because Demetrious [was] in there getting some of [his] things." Singletary Dep. 52:7-14. Eventually, the officer allowed Singletary to enter the apartment. Singletary recalled that she and Queen "started conversating about the events that were going on that led up to this point and all that happened" for about fifteen minutes, during which time she "was upset." *Id.* at 58:1–17. But, she insisted, "the conversation wasn't an angry conversation." *Id.* at 59:7–8. She stated that they were "talking . . . in a normal voice" that she did not "think . . . was too loud." *Id.* at 102:17–18.

After about fifteen minutes, the officers knocked and entered the apartment and told Queen "he needed to leave . . . for the night." Singletary Dep. 64:4–15. Queen "question[ed] why he had to leave." *Id.* at 64:15-17. Still, he "stood up" and "walked out" as the officers

6

"escorted him out into the hall." *Id.* at 65:8–9, 67:1–6. Gerald's testimony corroborated Singletary's in this regard. Gerald Dep. 22:1–19, 30:20 – 31:9.

Singletary testified that, from her vantage point at the peephole of the door, she saw the officers handcuff Queen, order him to be quiet, and when he did not comply, one officer struck him twice in the face and "slammed him to the ground." Singletary Dep. 66:12–14, 68:2 – 69:15, 71:2–3. She said that they handcuffed him before striking him and did not use pepper spray, a baton, a taser, or a handgun. *Id.* at 71:2–12. Gerald agreed that, after the other officer "pulled out her handcuffs" and "finally put[] Demetrious['s] arms behind his back," May punched Queen twice with his "fist balled up," and the officers "thr[e]w Demetrious onto the ground in the hallway," but did not use any weapons. Gerald Dep. 42:8 – 44:18; 47:6–21. Singletary testified that "they dragged him down," although she could only see the beginning of their departure, and "took him out of the building." Singletary Dep. 74:11–14. She explained that they had "lift[ed] him up" so that "he was up but it wasn't like he was just willingly walking out." *Id.* at 105:3–11.

According to Gerald, the conversation in the apartment was more heated than Signletary described. She stated that it was not an "argument," but rather "more of her [Singletary] yelling at . . . still upset about what happened to her car," and based on "the tone of [Queen's] voice, how loud it was, anybody coming over there probably thought it probably was a[n] argument . . . ." Gerald Dep. 56:7–12, 57:3-6. Gerald testified that Queen and Singletary were "belligerent and loud" that night, and that when they started talking in the apartment, "their voices just started erupting." *Id.* at 34:19–21, 67:12–21. As Gerald recalled, before Queen was handcuffed, he was "yelling," and afterwards, he was "getting more belligerent" and "cussing." *Id.* at 42:1–15.

7

May remembered the evening differently. He and the other officers returned to their cars after releasing Queen, and then they "heard loud screaming and yelling coming from Apartment 302 at 900 Hill Road." May Dep. 23:24 – 24:4. He and Officer Rood "approached that apartment due to the sounds of distress." *Id.* He said it "appeared to be a female and male voice." *Id.* at 24:22–23. He said that Officer Rood asked Queen to step outside the apartment to speak with them, "for officer safety reasons." *Id.* at 24:15–18.

In the hallway, Queen "became very loud and belligerent again." *Id.* at 27:11–15. "For him not complying, and for him being belligerent, and continuing to disturb others, we decided to place him under arrest at that time." *Id.* at 30:10–13. May clarified that Queen had not "done anything physical" at that time, but "was disturbing the peace" by yelling. *Id.* at 30:14–20. May stated that he and the other officer tried to calm Queen down "but due to his belligerent state, [they] decided it was better for the community to go ahead and place him under arrest and remove him from the incident." *Id.* at 77:14–18.

May said that he and Officer Rood had difficulty handcuffing Queen, who "raised his left elbow and attempted to elude [May's] control." May Dep. 31:3–6. May "ordered him to stop resisting arrest," and when he "continued to resist," May "used the stun and distract technique, and [he] used an armbar to take Mr. Queen to the ground." *Id.* at 31:7–11. The "stun and distract technique" involved "use [of] a palm heel strike to his upper torso, to distract him, to get him off balance, to then take him to the ground." *Id.* at 31:18-23. However, the strike landed on "his right cheek" instead of his torso "due to his height." *Id.* at 32:2–4. The officers "stood Mr. Queen up and escorted him down to [their] vehicles" and to the hospital. *Id.* at 45:20 – 46:13. His physical examination at the hospital revealed "dried blood on lips" and a "facial contusion";

he was prescribed Naproxen.[4] Hosp. Recs. 10–11, 14. While in May's police cruiser, Queen was "loud and belligerent" and "spitting blood all over [the] car, which did at one time strike [May]." *Id.* at 47:10–14. May charged him with assaulting a police officer, first and second degree assault based on the blood spatter, disorderly conduct for "being loud and belligerent, and keeping neighbors in the area continuing calling on him," failure to obey a lawful order based on resisting arrest, and malicious destruction of property for "spitting blood all over [his] computer and all over [his] car," but ultimately, these charges were dropped. *Id.* at 59:15 – 66:18.

## Discussion

### Arrest without Probable Cause and False Arrest

In arguing for judgment in Defendants' favor on Queen's § 1983 claims based on arrest without probable cause, in violation of the Fourth Amendment (Counts VI and VII) and Queen's false arrest claim (Count III), May focuses his discussion on his assertion that he had probable cause, arguing that, because he "had probable cause to make an arrest . . . , he is entitled to qualified immunity regarding Plaintiff's Fourth Amendment claim," and even without probable cause, Queen's false arrest claim fails. Def.'s Mem. 12–13. "[T]he defense of qualified immunity . . . protects law enforcement agents from federal claims when they act in objectively reasonable reliance on existing law." *Rockwell v. Mayor & City Council of Baltimore*, No. RDB-13-3049, 2014 WL 949859, at *8 n.10 (D. Md. Mar. 11, 2014). Thus, police officers are not liable under § 1983 unless "'(1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was 'clearly established' such that a reasonable person would have known his acts or omissions violated that right." *Streater v. Wilson,* 565 F.

---

[4] "Naproxen is a nonsteroidal anti-inflammatory drug (NSAID). It works by reducing hormones that cause inflammation and pain in the body." www.drugs.com/naproxen.html.

App'x 208, 210 (4th Cir. 2014) (quoting *Brockington v. Boykins,* 637 F.3d 503, 506 (4th Cir. 2011) (internal citations omitted)). Defendant carries the burden of proving qualified immunity. *McDonnell v. Hewitt–Angleberger,* No. WMN-11-3284, 2013 WL 4852308, at *3 (D. Md. Sept. 9, 2013) (quoting *Meyers v. Baltimore Cnty., Md.,* 713 F.3d 723, 731 (4th Cir. 2013)).

Queen's Amended Complaint alleges that May's acts violated Plaintiff's right to be free from arrest without probable cause. Am. Compl. ¶ 21. Certainly, "[a] warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment *if the arrest is supported by probable cause*."[5] *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (citing *United States v. Watson,* 423 U.S. 411, 424 (1976); *Atwater v. Lago Vista,* 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.")) (emphasis added). Thus, there is "'a clearly established Fourth Amendment right to be arrested only upon probable cause,'" and an "'arrest[] when no reasonable officer could believe, in light of the contours of the offense at issue, that probable cause exists to arrest that person,'" violates that right. *Peters v. City of Mount Rainier*, No. GLH-14-955, 2016 WL 1239921, at *4 (D. Md. Mar. 24, 2016) (quoting *Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001)). "An officer has probable cause for an arrest 'when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an

---

[5] In *United States v. McNeill*, the Fourth Circuit observed that precedent is unclear with regard to "whether the Fourth Amendment contains an 'in the presence' requirement for warrantless misdemeanor arrests," and declined to resolve the issue. 484 F.3d 301, 311 (4th Cir. 2007). Its resolution is not material to this case, as it is undisputed that the conduct at issue occurred in May's presence.

offense."'" *Burno-Whalen v. Maryland*, No. GJH-15-564, 2016 WL 1259556, at *6 (D. Md. Mar. 28, 2016) (quoting *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003) (quoting *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992))).

Yet, the elements of false arrest under Maryland law are (1) "'the deprivation of the liberty of another,'" (2) "'without consent,'" and (3) "'*without legal justification*.'" *Prince George's County v. Longtin*, 19 A.3d 859, 893 (Md. 2011) (quoting *Heron v. Strader*, 761 A.2d 56, 59 (Md. 2000) (emphasis added in *Longtin*)). Because it is undisputed that May deprived Queen of his liberty without his consent when he arrested him for disorderly conduct, *see* Def.'s Mem. 7–8, 12, I will focus on the third element. It is true that legal justification for a warrantless *felony* arrest exists where a police officer "'has probable cause to believe that a felony has been committed, and that the arrestee perpetrated the offense.'" *Longtin*, 19 A.3d at 893 (quoting *Ashton v. Brown*, 660 A.2d 447, 472 (Md. 1995) (citations omitted)). But, legal justification for a warrantless arrest *for a misdemeanor*, in contrast, requires that the "misdemeanor was actually committed in a police officer's view or presence." *Ashton*, 660 A.2d at 472. Thus, "probable cause is not a defense in an action for false imprisonment based upon a police officer's warrantless arrest for the commission of a non-felony offense." *Id.* Therefore, the question on the false arrest count is not one of probable cause but rather whether the undisputed facts show that May had legal justification for depriving Queen of his liberty without his consent. *See Longtin*, 19 A.3d at 893. And, on summary judgment, the issue for that count is whether, when viewing the facts "in the light most favorable to the plaintiff, a fact-finder could infer the plaintiff was not committing the charged crime." *Ross v. Early*, 899 F. Supp. 2d 415, 430 (D. Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).

Disorderly conduct, the only offense with which May charged Queen that allegedly already had occurred when May attempted to arrest Queen, May Dep. 59:15 – 66:18, is a misdemeanor that occurs when a person "willfully act[s] in a disorderly manner that disturbs the public peace."[6] Md. Code Ann., Crim. Law § 10-201(c)(2) (2015).  Here, the undisputed facts show that May and other County officers, responding to two sequential 911 calls, observed Queen outside 900 Hill Road smelling of alcohol and "yelling . . . at himself," loudly; warned him that his behavior was "an arrestable offense for disturbing the peace," and temporarily handcuffed him in an effort to calm him down.  May Dep. 23:4–14.  Once he calmed down, the officers released him, *id.*, and Queen does not challenge that detention.  Moreover, May's undisputed testimony establishes that Queen was not placed under arrest at that time, and, after he calmed down, the officers decided not to arrest him. *See id.*

Queen challenges his arrest a short while later.  At that time, May and Officer Rood, who were still in the same location, went up to Singletary's third-floor apartment.  It is disputed why they went to the apartment and what happened next.  According to May, they heard what sounded like a male and a female voice arguing loudly in the apartment.  May Dep. 23:24 – 24:23.  Indeed, Gerald testified that Singletary and Queen were "belligerent and loud" and their voices were "erupting" from the apartment.  Gerald Dep. 34:19–21, 67:12–21.  Officer Rood asked that Queen step outside, and in the hallway, Queen "became very loud and belligerent again." May Dep. 24:15–18, 27:11–15.  The officers then decided to arrest him.  Were Queen still yelling loudly, in the apartment and/or outside the door, after having been the cause of two

---

[6] Neither party suggests that Queen had committed first degree assault, second degree assault, failure to obey a lawful order, or malicious destruction of property at the time of his arrest. Those charges appear to relate to his conduct while in custody, in the police cruiser and at the hospital.

prior noise complaints in close succession and having been handcuffed in an effort to quiet him, May certainly could have had probable cause for arresting him at that point for disturbing the peace, and he could have had legal justification for the arrest, as he would have been present to hear Queen yelling at about 4 o'clock in the morning. *See Burno-Whalen*, 2016 WL 1259556, at *6; *Ashton*, 660 A.2d at 472; Crim. Law § 10-201(c)(2).

But, according to Singletary, she and Queen had not raised their voices in the apartment; the officers apparently went to the apartment because Queen had only gone in to "get[] some of [his] things" and had not yet returned downstairs. Singletary Dep. 52:7–14, 66:1–5, 102:17–18. Queen "question[ed] why he had to leave," but did not raise his voice to the officers either. *Id.* at 64:15-17. The officers escorted Queen out of the apartment, where he continued to talk and to question what they were doing, but without yelling. *Id.* at 65:8–9, 67:1 – 69:5. Therefore, a genuine dispute exists regarding the material facts that would support May's assertion of probable cause.

A court's task on summary judgment is not to assess credibility or weigh the evidence. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *Bennett v. Green*, No. JKB-15-3026, 2016 WL 2866859, at *1 (D. Md. May 17, 2016); *see Gunning v. Cooley*, 281 U.S. 90, 97 (1930) ("[T]he credibility of witnesses and the weight to be given to their testimony are for the jury[.]"). Viewing these facts in the light most favorable to Queen and accepting Singletary's credibility as a witness, a reasonable finder of fact could find that Queen was *not* committing disorderly conduct at the time of his arrest. *See Ross*, 899 F. Supp. 2d at 430; Crim. Law § 10-201(c)(2). Thus, were a jury to find Singletary's testimony more credible, then, despite his presence at the scene, May could not establish that he had either probable cause or legal justification for arrest for disorderly conduct. *See Wilson*, 337 F.3d at 398; *Burno-*

*Whalen*, 2016 WL 1259556, at *6; *Ashton*, 660 A.2d at 472. As a result, he also could not establish that he was entitled to qualified immunity on the federal claim. *See Streater*, 565 F. App'x at 210. Consequently, summary judgment is not appropriate on these claims. *See Pringle*, 540 U.S. at 370; *Longtin*, 19 A.3d at 893.

### Excessive Force

May insists that he "was entitled to use reasonable force to effectuate the lawful arrest," and that he "is entitled to qualified immunity regarding Plaintiff's Fourth Amendment Excessive Force claim" (Counts IV and V). Queen alleges that May's acts violated Plaintiff's right to be free from excessive force. Am. Compl. ¶ 21. "The right to be free from excessive force stemming from a beating during an arrest was clearly established at the time of Plaintiff's alleged assault." *Brown v. Prince George's County*, No. DKC-07-2591, 2012 WL 3012573, at *8 n.18 (D. Md. July 20, 2012) (citing *Graham v. Connor*, 490 U.S. 386, 395–96 (1989)). Thus, the question is whether May employed excessive force. *See Streater*, 565 F. App'x at 210. "'Whether an officer has used excessive force is judged by a standard of objective reasonableness.'" *Streater*, 565 F. App'x at 211 (quoting *Clem v. Corbeau,* 284 F.3d 543, 550 (4th Cir. 2002)). The Court considers "'whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.'" *Id.* (quoting *Elliott v. Leavitt,* 99 F.3d 640, 642 (4th Cir. 1996)). Relevant "facts and circumstances include 'the severity of the crime at issue,' whether the 'suspect poses an immediate threat to the safety of the officers or others,' and whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight,'" as well as "[t]he extent of the plaintiff's injury." *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (quoting *Graham*, 490 U.S. at 396; citing *Rowland v. Perry,* 41 F.3d 167, 174 (4th Cir. 1994); referring to factors as "*Graham* factors").

In *Jones*, the intoxicated plaintiff was at the police station and in handcuffs voluntarily, in an effort to sober up for an unrelated court proceeding the next day. *Id.* at 523. He was "yelling obscenities" and tried to stand up from the chair where an officer had sat him down roughly. *Id.* at 523–24. An officer knocked him down, jumped on him, and punched him in the face. *Id.* Jones was charged for "his conduct during this incident," but the charges were dropped. *Id.* at 525. He brought an § 1983 case and, after a magistrate judge granted summary judgment in the officer defendants' favor, concluding that the amount of force used was reasonable, the Fourth Circuit reversed. *Id.* at 523, 525. It reasoned that the first factor weighed in Jones's favor as "jones committed *no* crime," and "[e]ven in a case in which the plaintiff had committed a crime, when the 'offense was a minor one,' [the court has] found that the first *Graham* factor weighed in plaintiff's favor . . . ." *Id.* at 528. As for the second factor, the Fourth Circuit stated that "mere use of foul language, even a drunk's loud use of such language in a police station, does not justify an objectively reasonable police officer knocking the drunk down, jumping on him, and breaking his nose" when he was handcuffed and in a secure location, such that he was not posing a threat. *Id.* at 529–30. With regard to the third factor, the court noted that Jones did not attempt to flee. *Id.* at 530. And, the fourth factor, like the others, weighed in Jones's favor, as the officer "caused severe injuries." *Id.*

To determine the availability of qualified immunity, I take the facts alleged "'in the light most favorable to the party asserting the injury.'" *Meyers v. Baltimore Cnty.*, 981 F. Supp. 2d 422, 429 (D. Md. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from on other grounds in Pearson v. Callahan*, 555 U.S. 223 (2009)). Even viewed in the light most favorable to Queen, the facts certainly do not establish what Queen pleaded – that he was struck seven or eight times, by multiple officers, and using both their hands and batons. *See* Am.

Compl. ¶ 7. Yet, they do show that, based on the alleged commission of the misdemeanor of disorderly conduct, and after Queen verbally protested but did not physically resist arrest and was already in handcuffs, May struck him twice with his hand and took him to the ground. Singletary Dep. 66:12–14, 68:2 – 69:15, 71:2–3; Gerald Dep. 42:1 – 44:18; 47:6–21. There is no evidence that he attempted to flee. Although Queen's injuries—a facial contusion and an unknown cut causing blood on his lips—were not severe, under these circumstances, no threat existed to justify May's use of force. *See Jones*, 325 F.3d at 523–24, 528–31. Consequently, a reasonable jury could find that May used excessive force and was liable under § 1983. *See Streater*, 565 F. App'x at 210. May is not entitled to judgment as a matter of law on Queen's excessive force claim. *See id.*; Fed. R. Civ. P. 56(a).

## Assault and Battery

In contending that Queen's excessive force claim cannot survive the summary judgment motion, May asserts that "Plaintiff's claims of common law Assault and Battery also fail," Def.'s Mem. 15, but he does not provide any basis for his assertion. Consequently, he has not given the Court what is necessary to evaluate his entitlement to summary judgment. *See* Fed. R. Civ. P. 56(a) (stating that movant must show that he "is entitled to judgment as a matter of law"); Fed. R. Civ. P. 56(c)(3) (stating that "[t]he court need consider only the cited materials" in reviewing a motion for summary judgment); Loc. R. 105.1 ("Any motion . . . shall be . . . accompanied by a memorandum setting forth the reasoning and authorities in support of it."). May's Motion for Summary Judgment is denied without prejudice insofar as it seeks judgment on Queen's assault and battery claims.

**Conclusion**

May's Motion for Summary Judgment is DENIED. This case will proceed to trial. I will appoint *pro bono* trial counsel for Queen and schedule a telephone conference to set in a jury trial. A separate order shall issue.

Dated: May 25, 2016                                   /S/
                                                                    Paul W. Grimm
                                                                    United States District Judge


lyb